**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SABRINA S., <br><br>     *Plaintiff*, <br><br>     vs. <br><br> CAROLYN COLVIN, *Acting Commissioner of Social Security*, <br><br>     *Defendant*. | No. 3:24-cv-01915-MPS |

**<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>**

The plaintiff has filed an administrative appeal under 42 U.S.C. § 405(g) against the

Commissioner of Social Security, challenging the denial of her application for Disability Insurance

benefits. She argues that the Court should reverse the Commissioner's decision on five grounds:

(1) that she did not knowingly and intelligently waive her right to counsel; (2) that the ALJ did not

adequately develop the administrative record; (3) that the ALJ's Step 2 analysis was inadequate;

(4) that the ALJ did not adequately consider her fibromyalgia; and (5) that the ALJ's Step 5

findings were unsupported. ECF No. 24. The Commissioner has filed a motion to affirm the ALJ's

decision. ECF No. 28. I disagree with the plaintiff's arguments and therefore GRANT the

Commissioner's motion.

I assume familiarity with the plaintiff's medical history. I also assume familiarity with the

five sequential steps used in the analysis of disability claims, the ALJ's opinion, and the record.[1] I

cite only those portions of the record and the legal standards necessary to explain this ruling.

---

[1] Citations to the administrative record, ECF No. 13 *et seq.*, appear as "R." followed by the page number appearing
in the bottom right-hand corner of the record.

## I.    STANDARD OF REVIEW

The Court may vacate the agency's disability determination only if it is based on legal error

or unsupported by substantial evidence. *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022).

> The substantial evidence standard is a very deferential standard of review - even more so than the clearly erroneous standard . . . . Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . . In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.... If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld . . . . The substantial evidence standard means once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*

*Id.* at 74 (internal quotations and citations omitted) (emphasis in original).

## II.    DISCUSSION

### A.  The Right to Counsel

The plaintiff argues that her "waiver of her right to representation by an attorney was not

knowingly and intelligently made." ECF No. 24-1 at 23. During the hearing, the ALJ stated the

following:

> You have the right to be represented by an attorney or non-attorney. A representative can help you obtain information about your claim, submit evidence, explain medical terms, help protect your rights, and make any request or give any notice about proceedings before me.
>
> A representative may not charge a fee or receive a fee unless we approve it. There are some legal service organizations that offer representation without cost if you satisfy the qualifying requirement, like Legal Aid if you come in underneath their income guidelines.
>
> You also have the right to proceed without a representative, and if you do so, I will obtain the relevant medical and non-medical records and question you at the

2

> hearing. Nevertheless, a representative can present your evidence in a way that is most favorable to your case.

R. 51-52. The ALJ then asked the plaintiff if she had any questions about her right to representation and whether she "want[ed] to go forward with [her] hearing or . . . take the time to find a representative." *Id*. at 52. The plaintiff stated she had no questions and wanted "to proceed forward on her own." *Id.* She now argues that this waiver was not knowingly and intelligently made because the ALJ "did not inform [her] of the availability of representation by an attorney on a contingency fee basis," nor did he "discuss access to organizations that assist individuals in obtaining representation . . . ." ECF No. 24-1 at 23. I find that the plaintiff was adequately informed of her right to representation and that the plaintiff's waiver was therefore knowingly and intelligently made.

"Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 406 and 20 C.F.R. § 404.1705). Federal statutes and a regulation require the Commissioner to give claimants notice of this right. Under 42 U.S.C. Section 406(c), "[t]he Commissioner of Social Security shall notify each claimant in writing . . . of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security. Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge." 42 U.S.C. § 406(c); *see also* 42 U.S.C. § 1383(d)(2)(D) and 20 C.F.R. § 404.1706 (containing substantively identical provisions).

The record reflects the Commissioner's compliance with these requirements. In a February 21, 2024 decision letter denying the plaintiff's request for reconsideration, the Commissioner informed the plaintiff that she "may choose to have a representative help [her] with [her] case." R. 120. He further informed her that "many representatives charge a fee only if [she] win[s] [her] case," that "others may represent [her] for free," and that "[her] local Social Security office can give [her] a list of groups that can help [her] find a representative." *Id.* 121; *see also id.* 140 (letter from the Commissioner informing the plaintiff of the hearing process) ("You may choose to have a representative help you . . . Many representatives charge a fee only if you receive benefits. Others may represent you for free . . . We are enclosing a list of groups that can help you find a representative."); *id.* 159 (Notice of Hearing) ("You have the right to be represented by an attorney or non-attorney.").

In *Lamay*, the Second Circuit declined to adopt "enhanced disclosure requirements" that "required broader disclosures than those mandated by statute." 562 F.3d at 507-08. While other circuits have adopted these requirements, the Second Circuit takes the position that "the creation of statutory notice requirements in Sections 406(c) and 1383(d)(2)[(D)] supplanted prior judicially-created standards . . . ." *Id.* at 508. Accordingly, when a plaintiff argues that their waiver of counsel was not knowing and voluntarily made due to inadequate disclosure, "the statutory requirements are all that [courts] can apply." *Id.*

At the hearing, the ALJ also an obligation to ensure that claimants are aware of their right to counsel. *Id.* at 507 ("[A]t the hearing itself, the ALJ must ensure that the claimant is aware of [her] right [to counsel].") (internal quotations omitted) (alterations in original). Though the Second Circuit has not specified particular procedures for carrying out that duty, the record does not

support the conclusion that the ALJ's advisement in this case was so lacking as to deprive the plaintiff of her ability to knowingly and voluntarily waive her right to counsel. In *Lamay*, the Second Circuit held that the ALJ's colloquy with the claimant—one marred by technical difficulties and less fulsome than the disclosure at issue in this case[2]—sufficiently informed the plaintiff of her right to counsel. *Id.* at 506, 509.

Neither *Lamay*, nor other Second Circuit authority, nor any federal statute or regulation requires the precise disclosures the plaintiff argues for here. Perhaps for that reason, the plaintiff primarily relies on the "HALLEX"[3]—a Social Security publication, which, in part, states that ALJs should "explain the availability of . . . contingency representation and discuss access to organizations that assist individuals in obtaining representation." *See* ECF No. 24-1 at 23 (citing HALLEX HA 01210.080B.1). The Second Circuit has not addressed whether the HALLEX is

---

[2] Specifically, the ALJ and Lamay engaged in the following exchange:

> **ALJ:** I do need to inform you that you do have the right to legal counsel. If you wanted a lawyer and wanted to have a postponement of today's hearing, I would allow you to have such a postponement. On the other hand, you're not required to have a lawyer. So if you wish to present your case today without a lawyer, that's fine also. I want you to realize that you have both options.
> **Hearing Reporter:** You're breaking up again, Your Honor.
> **ALJ:** I want you to realize that you have both options, either continue with the hearing today or—
> **Hearing Reporter:** It's not working and we have little lightning strikes on the screen.
> **ALJ:** Okay. Try it again. I will make sure that you know [INAUDIBLE] either to have a postponement of the hearing and get a lawyer or you can [go] forward with the hearing today. It's your choice.
> **Lamay:** Go forward, please, Judge.
> **ALJ:** You want to go forward?
> **Lamay:** Please.
> **ALJ:** Okay. Again, I find that the Claimant's mother has waived her right to counsel [INAUDIBLE] case.

*Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 506 (2d Cir. 2009).

[3] The "HALLEX"—or "Hearings, Appeals, and Litigation Law Manual"—is a Social Security Administration publication that "conveys guiding principles, procedural guidance, and information to hearing level and Appeals Council staff." HALLEX HA 01105.001.

binding on the Commissioner. District courts in this Circuit have nevertheless held it is not. *See Louisiana S. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00130, 2021 WL 911691, at *5 (N.D.N.Y. Mar. 10, 2021) ("[D]istrict courts within the Second Circuit have found that HALLEX policies are not regulations and therefore not deserving of controlling weight.") (internal quotations omitted) (citing cases).[4] The ALJ's failure to abide by the strict letter of the HALLEX is therefore not a basis for remand—especially where, as discussed above, the record indicates that the Commissioner's disclosure of the plaintiff's right to counsel satisfied his obligations under federal law, and the ALJ otherwise informed the plaintiff of this right in detail.

### B. Development of the Administrative Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). "Where . . . the claimant is unrepresented by counsel, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Echevarria v. Sec'y of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The plaintiff argues that there "are significant gaps in the Administrative Record," including the absence of "any opinion evidence from treating

---

[4] Some courts in this Circuit have taken a more nuanced view of the HALLEX's binding force. For example, the plaintiff cites *Edwards v. Astrue*, which holds that "an administrative agency is required to follow its own internal policies when they accord with or are more demanding than the statute or its regulation" and that "where HALLEX policies authorize procedures not addressed in the regulations or statute, they do not have the force of law." No. 3:10-cv-1017, 2011 WL 3490024, at *6 (D. Conn. Aug. 10, 2011); *see also* ECF No. 29 at 5. Even under this view, the HALLEX provision at issue lacks the force of law because what, if anything, the ALJ must say at the hearing about the right to counsel is not addressed by statute or regulation. The Court could not find—nor does the plaintiff point to—any statute or regulation placing an affirmative burden on the ALJ to inform the plaintiff of the right to counsel at the hearing.

physicians/clinicians," as well as medical evidence relating to the plaintiff's residual functional capacity ("RFC"). ECF No. 24-1 at 25-26. The plaintiff's argument is unavailing.

"An ALJ's decision must be supported by substantial evidence – but there is no blanket requirement that such a decision must be supported by a congruous medical opinion for it to meet that evidentiary standard." *Rubin v. Comm'r of Soc. Sec.*, 116 F.4th 145, 155 (2d Cir. 2024). Moreover, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

In support of her argument that the record was inadequately developed, the plaintiff points to a variety of documents missing from the record, including a handful of "'outside' medical records not scanned into the VA system," records relating to the her treatment with licensed clinical social worker ("LCSW") Cindy Daigneault, and a "DA FORM 7809" completed by Dr. Waterman. ECF No. 24-1 at 25. Neither the Commissioner nor the ALJ was under any obligation to solicit these records.

42 U.S.C. Section 423 requires the Commissioner to, in part, "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)B. The plaintiff filed her disability application on October 20, 2023, ECF No. 24-1 at 1, and the Commissioner was therefore obligated to develop a complete medical history beginning as early as September 2022. *See also* 20 C.F.R. § 416.912(b) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your

application unless there is a reason to believe that development of an earlier period is necessary."). Here, the portions of the record cited by the plaintiff that allude to these documents predate September 2022. *See* R. 1313 (May 19, 2021); *id.* 1355 (April 7, 2021); *id.* 1378-79 (January 6, 2021); *id.* 1391 (December 5, 2020); *id.* 1380 (June 2019). As to LSCW Daigneault's treatment records, there is no evidence—or suggestion—that she was treating the patient as late as September 2022. The most recent evidence of treatment appears in a note dated June 3, 2022, and suggests only that the plaintiff was "connected with 'Norwich Vet Center'"—Daigneault's place of employment—at that time. R. 1540

Furthermore, the plaintiff does not explain why these missing records constitute "clear gaps," nor how they could have produced a different outcome. *See Gaathje v. Colvin*, No. 3:15-cv-01049 (VLB), 2017 WL 658055 (D. Conn. Feb. 17, 2017) ("[The plaintiff] has failed to establish that ALJ Alger's failure to develop the record . . . was harmful.") (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.")). As far as Daigneault's treatment course is concerned, a summary of her conclusions, in which she opines on the severity of the plaintiff's PTSD, is in the record. R. 2249. Because the ALJ did not cast doubt on the plaintiff's PTSD diagnosis—finding it to be a severe impairment, R. 35—there was no reason for him to solicit Daigneault's "underlying chart notes." *See* ECF No. 24-1 at 25; *see also* R. 2250-51 (letter from LCSW Susan Tobenkin, further opining on the plaintiff's PTSD). Any omission of Dr. Preen's February 24, 2021 neuropsychological exam or Dr. Waterman's DA FORM 7809 is likewise harmless. The record contains extensive notes of a neurological examination conducted on January 17, 2024—almost three years after Dr. Preen's examination—and those notes show that the

examiners reviewed Dr. Preen's 2021 report. *See* R. 1479-80. And Dr. Waterman's DA FORM 7809 appears to address the plaintiff's fibromyalgia, *see id.* 1361, an impairment for which extensive evidence appears in the record and which the ALJ considered extensively (as discussed further below).

The plaintiff also cites a number of authorities, all of which suggest that when an ALJ disregards the opinions or diagnoses of a treating physician on the basis of some inconsistency or omission, he or she has an obligation to first seek clarification. *See, e.g.*, *Sullivan v. Berryhill*, No. 3:17-cv-01524 (MPS), 2018 WL 6075671, at *4 (D Conn. Nov. 21, 2018) ("[T]he applicable regulations require an ALJ to seek additional evidence or clarification from the medical source when a report from the medical source contains a conflict or ambiguity that must be resolved to determine whether the claimant is disabled.") (internal quotations omitted). In *Sullivan*, the ALJ assigned "little weight" to a provider statement that contained no name and an illegible signature. *Id.* at *3. I remanded, holding that because the statement addressed "critical issues," the ALJ was required to "take [ ] steps to clarify the author of the medical statement." *Id.* at *4. The analysis in these cases is informed, in part, by the "Treating Physician Rule"—a rule that does not apply here. *See Colgan v. Kijakazi*, 22 F.4th 353, 359 n.2 (2d Cir. 2022) ("For claims filed after March 27, 2017 . . . ALJs will not defer or give any specific evidentiary weight, *including controlling weight*, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.") (internal citations omitted) (emphasis in original) (citing 20 C.F.R. §§ 404.152c(a) and 416.920(c)).

The plaintiff also directs the Court's attention to *Guillen v. Berryhill*, 697 F. App'x 107 (2d Cir. 2017) (summary order.). In *Guillen*, the Second Circuit held that the ALJ's failure to develop

the record—specifically, the failure to obtain a "medical source statement" from the plaintiff's treating physician—warranted remand because the record "[did] not shed any light on Guillen's residual functional capacity." *Id.* at 108. In addition to being governed by the Treating Physician Rule, *Guillen* is distinguishable because in this case the ALJ had a record exceeding 2,000 pages that, as discussed below, provided an ample basis to assess an RFC.

"Assessing whether it was legal error for an ALJ to fail to request clarification from a treating physician is a case-specific inquiry that turns on whether an ALJ could reach an informed decision based on the record." *Vozzella v. Berryhill*, No. 3:18-cv-356(DFM), 2019 WL 1324951, at *3 (D. Conn. Mar. 25, 2019). Remand is not required where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r Soc. Sec.*, 521 Fed. App'x 29, 34-35 (2d Cir. 2013) (summary order) (holding that the "voluminous record" was "adequate to permit an informed finding by the ALJ" as to the plaintiff's RFC).

> At Step 4, the ALJ determined that the plaintiff had the RFC to:
>
> perform sedentary work as defined in 20 CFR 404.1567(a) except she requires a sit/stand option: sit for 30 minutes, alternate to standing position for 5 minutes, then resume sitting. Never climb ladders/ropes/scaffolds. Occasionally climb stairs/ramps, balance, stoop, and crouch. Never kneel/crawl. No overhead reaching. No work in exposure to cold/heat extremes. She can perform simple, routine, repetitive tasks. She can sustain concentration, persistence, and pace for 2-hour segments. No vocational limits interacting with supervisors, coworkers, and the public. Work with little/no changes in duties/routines. No work requiring independent judgment (no setting duties/schedules for others, no responsibility for the safety of others).

R. 38. The 2,500-page record contains substantial evidence to support these findings, as set forth in the Commissioner's motion to affirm. ECF No. 28-1 at 9-10.

First, there are the opinions rendered by the state-appointed physicians. One such physician found that the plaintiff had the following limitations: 1) "exertional limitations," including limiting occasional lifting to no more than 20 pounds and frequent lifting to no more than 10 pounds; 2) "environmental limitations," including avoiding concentrated exposure to noise, fumes, odors, dusts, gases, and poor ventilation; and 3) "sustained concentration and persistence limitations," including a moderately limited ability to maintain attention and concentration for extended periods of time and a moderately limited ability to perform activities within a schedule or maintain a schedule. R. 85-87. That physician also opined that the plaintiff "can carry out simple and repetitive tasks . . . for 2 h[ou]r periods across a normal workday and work week w[ith]out special supervision," *id.* 87, and that the plaintiff is limited to light and unskilled work.[5] *Id.* 88. There was also the opinion of the state-appointed psychologist, who concluded that the plaintiff is "anxious, stressed and distrustful of others but can relate adequately for the purpose of completing working activities in a low demand setting." *Id.* 100. This latter opinion, in particular, supports the ALJ's determination that the plaintiff's RFC is limited "to work with little/no changes in routines as well as the restriction against independent judgment making." *Id.* 40.

Second, there are the plaintiff's medical records. Those records span over 2,000 pages and substantially corroborate the ALJ's RFC findings. *Id.* 39-41. For instance, treatment notes repeatedly confirm that the plaintiff retains full strength in her extremities. *See, e.g.*, *id.* 1020 (exam note, dated September 27, 2022) (finding normal strength in the upper extremities); *id.* 1138 (emergency room encounter note, dated April 13, 2022) (finding that the plaintiff "ambulates

---

[5] The ALJ found these opinions to be "partially persuasive," but nevertheless did "not accept the finding for Light Work, as that did not consider [the plaintiff's] [fibromyalgia] symptoms." R. 41.

well," with "5/5 strength in [her] upper and lower extremities"). There is also evidence that while long hours exacerbate the plaintiff's back pain, that pain is amenable to improvement. *Id.* 1207 (chiropractic note, dated December 30, 2021) ("Reports several weeks of improved pain levels, however pain has returned which she relates to holiday stress and long work hours."). These records also suggest that many of the plaintiff's other physical ailments—e.g., the swelling in her hands and feet, as well as her fibromyalgia—while potentially limiting, are not debilitating. *See id.* 411 (rheumatology note, dated February 2, 2024) (finding "no enlarged joints or exquisitely tender joints on light palpation . . . negative for edema . . . It appears that most of the 'swelling' is related to her recent weight gain and does not repres[ent] synovitis"); *id.* 541 (chiropractic note, dated October 10, 2023) (noting that the plaintiff reported "better pain control and fewer fibro[myalgia] flares with intermittent acupuncture").

Furthermore, these records support the ALJ's conclusions concerning the plaintiff's mental capacity—i.e., "She can perform simple, routine, repetitive tasks. She can sustain concentration, persistence, and pace for 2-hour segments. No vocational limits interacting with supervisors, coworkers, and the public. Work with little/no changes in duties/routines. No work requiring independent judgment (no setting duties/schedules for others, no responsibility for the safety of others)." *Id.* 38. As noted by the ALJ in his written decision, *id.* 40, exam notes repeatedly describe the plaintiff's thought processes as "linear" and "logical." *Id.* 1085-86, 1147, 1171, 1199, 1241. Those notes also describe the plaintiff's concentration, attention, and judgment as "fair" and sometimes "good." *Id.*  Moreover, a neuropsychological exam conducted on January 17, 2024—roughly three months after the plaintiff initially filed for disability benefits—found "no evidence of word-finding difficulties" and concluded that the plaintiff's executive functions were largely

12

average. *Id.* 1481-82 ("Executive Functions: The Veteran's abstract verbal and nonverbal abilities were average. Her ability to grasp concepts on a task involving non-routine problem-solving was demographically within normal limits and largely free from excessive or perseverative error. Performance on a speeded task of cognitive flexibility and rapid switching was average.").[6] And in a mental health treatment note dated July 2, 2024, the plaintiff reported her "mood, anxiety, focus, and concentration" as stable. *Id.* 2467

Third, there is the plaintiff's own testimony. The plaintiff stated: 1) that she is able to groom and bathe herself, *id.* 60; 2) that prolonged standing, sitting and lying down aggravate her pain, but "low intensity movement,"—i.e., a walk or standing up—makes the pain better, *id.* 63; 3) that her current pain is "noticeable," but she's "not debilitated," *id.*; 4) that her pain is most severe at night, *id.* 64; 5) that between therapy and medication, she has seen improvement in her anxiety symptoms, *id.* 65; 6) that her anxiety symptoms do not prevent her "from getting along with the public," *id.*; 7) that she has difficulty with "sustained concentration" and short-term memory and jobs that are "reading intensive," like her previous job at the VA, *id.* 66; 8) that she could keep track of the characters and plot of a movie, as long as it was "new and interesting," *id.*; 9) that she could safely lift 15 pounds at one time, *id.* 67; 10) that she could walk "about a mile" in a "single stretch," *id.*; 11) that she could remain standing in one spot for twenty minutes, and that she could remain comfortably seated for twenty minutes, *id.* 68; and 12) that could bend over and touch her toes from a standing position, bring her arms over her head "with limited mobility," bring her arms

---

[6] As the Commissioner notes, the neuropsychological examiners had access to and relied upon a 2021 neuropsychological report that the plaintiff criticizes the ALJ for failing to include in the record. *See* R. 1480; *see also* ECF No. 24-1 at 25.

directly in front of her, and use her "fingers for smaller things like buttons or zippers or sorting coins." *Id.* at 68-69.

Though the ALJ did not fully credit other portions of the plaintiff's testimony alleging "very limited exertional abilities," *id.* 39, the above cited testimony is consistent with the plaintiff's medical records and supports a finding that the plaintiff has the RFC to engage in sedentary work. *See* C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

In light of the above, I conclude that the record was adequately developed and that the ALJ therefore had no duty to procure additional medical opinions or records. *See India M. o/b/o K.J. v. Comm'r of Soc. Sec.*, No. 6:20-cv-06230, 2021 WL 4272291, at *4 (W.D.N.Y. Sept. 21, 2021) ("[A]n ALJ is not required to request additional evidence where the report of a consultative examiner, coupled with other medical evidence, is sufficient to support his or her conclusions.")

### C.  Adequacy of the Step 2 Analysis

At Step 2, the ALJ must consider whether a claimant has a severe medically determinable impairment or combination of impairments. *See* C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."). The ALJ found that the plaintiff "has the following severe impairments:

14

Intracranial Hypertension, Fibromyalgia (FM), Raynaud's Syndrome, Anxiety, [and] Post-Traumatic Stress Disorder." R. 35. The plaintiff argues that the ALJ "ignored" her other severe conditions—namely, "chronic headaches, asthma, Chronic Fatigue Syndrome, idiopathic hypersomnia, lumbar sacral radiculopathy, persistent depression, ADHD, vasovagal syndrome, and dysautonomia."[7] ECF No. 24-1 at 28.

When an ALJ fails to consider severe impairments at Step 2, that error is harmless when the ALJ considers those impairments during the subsequent steps. *See Reices-Colon v. Astrue*, 523 Fed. App'x 796, 798 (2d Cir. 2013) (summary order) (holding that the ALJ's exclusion of anxiety disorder and panic disorder during Step 2 analysis was harmless error "because these conditions were considered during the subsequent steps"). Both parties agree that this standard governs the ALJ's analysis. *See* ECF No. 24-1 at 28 ("Had the ALJ considered these conditions later in his decision, in combination with [the plaintiff]'s other impairments, any error might arguably have been harmless."); ECF No. 28-1 at 14 ("Remand is typically not required simply because an ALJ does not discuss an impairment at step two (severity), as long as the ALJ proceeds throughout the sequential evaluation."). The parties disagree, however, on whether the ALJ considered these impairments during the remaining steps. The plaintiff contends that the ALJ left these conditions "entirely unmentioned." ECF No. 24-1 at 28. I disagree.

As the Commissioner points out, the ALJ either expressly addressed these impairments, addressed their associated symptoms, or otherwise relied upon medical opinions that considered these impairments. ECF No. 28-1 at 14-16. In determining the plaintiff's RFC, the ALJ considered

---

[7] The plaintiff argues that these impairments are "among others" the ALJ left unaddressed. ECF No. 24-1 at 28. To the extent that evidence of these other unaddressed impairments exists in the record, it is the duty of the plaintiff—and not the Court—to identify it.

the plaintiff's chronic headaches, *see* R. 39 ("Plaintiff has chronic headaches that are of unclear etiology . . . She is experiencing significant relief with Topamax.") (quoting a neurology note, dated January 2023, *id.* 829), as well as her lumbar sacral radiculopathy. *See id.* 39 ("The claimant had an exam for lumbar radiculopathy in August 2020 . . . Chiropractic notes from December 2021 show her treatment for chronic neck and low back pain. She had several weeks of improved pain. She had increased pain after working long hours.") (citing a clinic note, dated August 26, 2020, *id.* 2215, and a chiropractic note, dated December 30, 2021, *id.* 1207).

He also addressed the symptoms associated with other impairments. *See Melissa T. v. Comm'r of Soc. Sec.*, No. 3:23-cv-532 (JAM), 2024 WL 2382272, at *8 (D. Conn. May 23, 2024), *aff'd sub nom. Tucker v. Comm'r of Soc. Sec.*, No. 24-1979-cv, 2025 WL 1374660 (2d Cir. May 13, 2025) ("[A]ny error that resulted from the ALJ's failure to determine whether Plaintiff's [illness] was a medically determinable impairment was harmless because the ALJ considered symptoms that could have stemmed from [that impairment]."). He addressed the symptoms associated with her vasovagal syndrome and dysautonomia, *see* R. 38 ("She experiences severe heat and cold intolerance and starts to feel numbness and dizziness related to temperature.") (citing the plaintiff's testimony), and her depression and ADHD. *See id.* 37 ("The claimant has reported trouble with time management, organization, concentration, and short-term memory."); *id.* 40 ("The mental health treatment note from January 2024 has the claimant's report for feeling overwhelmed. She demonstrated logical, linear and goal directed th[]ough[t] process. Her memory and cognitive functioning appear intact.") (citing a mental health treatment note, dated January 25, 2024, discussing the plaintiff's ADHD and depression diagnoses, *id.* 1781); *id.* 40 ("The notes

16

from July 2024 indicate the claimant being more active. She had a stable mood, anxiety, and concentration.") (citing a mental health attending note, dated July 5, 2024, *id.* 2467).

Finally, there remains the plaintiff's chronic fatigue syndrome, idiopathic hypersomnia, and asthma. Although the ALJ did not expressly address these conditions at Step 2, he subsequently considered the opinions of the state physicians, who did address these conditions. *See, e.g.*, *id.* 82 (noting the plaintiff's allegations of asthma, chronic fatigue illness and idiopathic hypersomnia, as well as the plaintiff's claim that she is "debilitated [by her] severe chronic fatigue both mentally and physically . . . ."); *see also Drake v. Astrue*, 443 Fed. App'x 653, 657 (2d Cir. 2011) (summary order) ("[W]e agree with the District Court that the ALJ implicitly factored [plaintiff]'s obesity into his RFC determination by relying on medical reports that repeatedly noted [plaintiff]'s obesity and provided an overall assessment of her work-related limitations."). Taking these and the plaintiff's other alleged conditions into account, the state physicians opined as to the plaintiff's RFC. *See* R. 85-88 (referring to chronic fatigue syndrome, asthma, and idiopathic hypersomnia and finding the claimant capable of light work). Though the ALJ ultimately found these opinions to be only "partially persuasive"—rejecting the state examiners' finding for light work and instead determining that the plaintiff was capable of only sedentary work, *id.* 38, 41— he nevertheless considered them, and, to the extent he did find them persuasive, incorporated them into his own RFC determination.

In light of the above, I cannot say that the ALJ failed to address these conditions. Rather, all of these conditions, their symptoms, and their associated limitations "were part of the analysis" subsequent to Step 2. *Woodmancy v. Colvin*, 577 Fed. App'x 72, 74 n.1 (2d Cir. 2014) (summary order) (noting that, notwithstanding the ALJ's alleged failure to find certain severe impairments at

Step 2, there was "no error warranting remand because the ALJ did identify [other] severe impairments at step two, so [plaintiff]'s claim proceeded through the sequential evaluation process, in which all of [plaintiff]'s ailments were part of the analysis").

### D. The ALJ's Consideration of the Plaintiff's Fibromyalgia

The plaintiff argues the ALJ did not "adequately evaluate" her fibromyalgia. ECF No. 24-1 at 28. According to the plaintiff, "the ALJ manifested little understanding of the devastating impact [the plaintiff]'s fibromyalgia has had on every aspect of her life," *id.* at 29, and "has essentially waved to one side [the plaintiff]'s complaints of severe, chronic pain as not credible (albeit in a different guise)." *Id.* at 32. These arguments misconstrue the ALJ's written decision, which adequately considered the plaintiff's fibromyalgia in light of the objective medical evidence and the plaintiff's testimony.

In determining the extent to which a claimant's symptoms impact his or her capacity for work,[8] the Social Security Administration evaluates the "intensity and persistence" of those symptoms. 20 C.F.R. § 404.1529(c). Doing so involves considering, in part, "objective medical evidence . . . such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor

---

[8] It's unclear whether the plaintiff is arguing that the ALJ's evaluation of her fibromyalgia was inadequate in the context of his Step 3 determination that the illness was not medically equivalent to a listed impairment, *see* R. 36, or rather his determination of the plaintiff's RFC prior to Step 4. *See id.* 40. I assume the latter; though, even assuming the former, the claim of error fails. The ALJ's determination that the plaintiff's fibromyalgia, alone or in combination with other conditions, was not medically equivalent to the listed impairments in Appendix 1 was supported by substantial evidence. *See id.* 36 ("The undersigned has also evaluated whether fibromyalgia meets any listing, pursuant to [Social Security Ruling] 12- 2p. As is noted in SSR 12-2p, fibromyalgia cannot meet a listing in Appendix 1 because it is not a listed impairment. However, it can [equal] medically listing 14.09D, for example, inflammatory arthritis or it can medically equal a combination of listings. Here, the undersigned does not find evidence of an inability to ambulate effectively, the inability to perform fine and gross movements effectively, or that organ/body system involvement has occurred. Moreover, there is no joint deformity or two or more constitutional symptoms or signs.").

disruption." *Id.* § 404.1529(c)(2). Here, the ALJ cited the following objective medical evidence, all of which bore on the intensity and persistence of the plaintiff's fibromyalgia symptoms: 1) an August 2020 exam for lumbar radiculopathy, during which the plaintiff had "tenderness to palpation along the entire paraspinal area," R. 39; *id.* 2214; 2) a December 2021 chiropractic visit for chronic neck and lower back pain, during which the plaintiff reported "several weeks of improved pain levels," but that the pain had returned due to "holiday stress and long work hours," *id.* 39; *id.* 1207; 3) a September 2022 evaluation for cervical strain secondary to fibromyalgia, during which the plaintiff "reported numbness and tingling in the middle and ring fingers," and on exam had "full range of motion," "could perform repetitive use testing with at least three repetitions and no additional loss of function," and "had findings for 5/5 strength at her upper extremities," *id.* 39; *id.* 1669-73; 4) a February 2024 rheumatology visit for fibromyalgia, during which the plaintiff reported "increased swelling of her hands and feet in the last 3 months," and on physical exam, was found to have "no enlarged joints," "no exquisitely tender joints on light palpation," "no synovitis," and was "negative for edema," *id.* 39; *id.* 1744-45; and 5) a June 2024 rheumatology visit, during which the plaintiff "had tenderness to palpation at the low back near paraspinal muscles and at the trapezius muscles bilaterally around the neck," "5/5 strength in the upper extremities bilaterally," and "[n]ormal [range of motion] of the shoulder on flexion and abduction." *Id.* 39; *id.* 2418.

Notwithstanding the ALJ's reliance on this objective medical evidence under 20 C.F.R. Section 404.1529, the plaintiff argues that the ALJ failed to adequately evaluate her fibromyalgia "under the standards set forth in Social Security Ruling 12-2p . . . ." ECF No. 24-1 at 28. Social Security Ruling ("SSR") 12-2p provides the agency with guidance as to how it should evaluate

fibromyalgia. SSR 12-2p, 77 Fed. Reg. 43640 (July 25, 2012). The plaintiff does not state the criteria used for evaluating fibromyalgia under SSR 12-2p, nor does she expressly state how the ALJ's decision was in tension with, or violated, the SSR. SSRs, as agency guidance, are binding on the agency, *see* 20 C.F.R. § 402.160(b)(1) ("We publish Social Security Rulings in the Federal Register under the authority of the Commissioner of Social Security. They are binding on all components of SSA."), and ALJs are therefore required to follow them. Here, the ALJ complied with the applicable SSRs in considering the plaintiff's fibromyalgia symptoms.

SSR 12-2p states that "once a [medically determinable impairment] is established" the agency will "evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." SSR 12-2p (Part IV, B). "If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms," the agency will "consider all of the evidence in the case record" and, as explained in SSR 96-7p, "will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning." *Id.*

SSR 96-7p has been superseded by SSR 16-3p, which is the current agency guidance addressing the "evaluation of symptoms in disability claims." SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). SSR 16-3p provides that the agency, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms," will "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and

other persons; and any other relevant evidence in the individual's case record." *Id.* Addressing the

consideration of objective medical evidence, SSR 16-3p states:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

*Id.* The dictates of SSRs 12-2p and 16-3p accord with agency regulations that require the agency

to consider, in evaluating a claimant's symptoms, objective medical evidence, including medically

observable phenomena "such as evidence of reduced joint motion, muscle spasm, sensory deficit

or motor disruption." 20 C.F.R. § 404.1529(c)(2). But such objective medical evidence is just one

factor the Commissioner considers and is not, by itself, a basis for disregarding claimant's

allegations of symptoms, including pain. *See* SSR 16-3p ("However, we will not disregard an

individual's statements about the intensity, persistence, and limiting effects of symptoms solely

because the objective medical evidence does not substantiate the degree of impairment-related

symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies

in the objective medical evidence is one of the many factors we must consider in evaluating the

intensity, persistence, and limiting effects of an individual's symptoms."); C.F.R. § 404.1529(c)(2)

("However, we will not reject your statements about the intensity and persistence of your pain or

other symptoms or about the effect your symptoms have on your ability to work solely because

the available objective medical evidence does not substantiate your statements.").

The ALJ therefore did not err in relying on objective medical evidence to support his RFC determination. Nor did he err in deciding not to fully credit the plaintiff's statements concerning the intensity of her symptoms in light of this evidence. *See* R. 39 ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision . . . ."); *id.* ("At the hearing, the claimant alleged very limited exertional abilities . . . The undersigned does not credit the extent of these allegations."). While the plaintiff contends that the ALJ "waved to one side [the plaintiff]'s complaints of severe, chronic pain as not credible," ECF No. 24-1 at 32, the ALJ plainly credited those complaints, going so far as to disagree with the state examiner's opinion that the plaintiff was capable of light work because it "did not fully consider her [fibromyalgia] symptoms." R. 41. I therefore find that the ALJ's consideration of the plaintiff's fibromyalgia symptoms was adequate, supported by substantial evidence, and is not a basis for remand. *See Tammy L. v. Kijakazi*, No. 3:21-cv-01026 (KAD), 2022 WL 2952626, at *9 (D. Conn. July 26, 2022) ("[I]t is the claimant who bears the burden of providing evidence establishing the severity of the condition. Where a lack of supporting evidence on a matter for which the claimant bears the burden is combined with other inconsistent record evidence, an ALJ has substantial evidence to support a denial of benefits."); *id.* (holding that the ALJ—who found that plaintiff's "testimony regarding the 'intensity, persistence and limiting effects' of her [fibromyalgia] symptoms were not consistent with the medical evidence in the record" and "specifically referred to evidence showing that [p]laintiff's symptoms improved or resolved with treatment"—had, on that basis, appropriately limited the plaintiff to sedentary work).

### E.  The ALJ's Step 5 Findings

At the hearing, the vocational expert testified that there were jobs in the national economy that an individual with the plaintiff's age, education, work experience, and limitations could perform—specifically: an order clerk, for which 20,000 full-time jobs existed; an electronics assembler, for which 30,000 full-time jobs existed; and an information clerk, for which 15,000 full-time jobs existed. R. 71-74. On the basis of that testimony, the ALJ concluded at Step 5 that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and that a "finding of 'not disabled' is therefore appropriate . . . ." *Id.* 42.

The plaintiff argues that the ALJ's Step 5 findings were unsupported, both because they relied upon an RFC determination that was itself not supported by substantial evidence, ECF No. 24-1 at 34 ("If the hypothetical question is defective, the response may not serve as substantial evidence to undergird the Commissioner's decision."), and because the "vocational witness did not testify as to the sources of his job incidence data." ECF No. 24-1 at 33. As to the former argument, it hinges on a claim of error I have already rejected. As to the latter, the vocational expert was not required to disclose his sources or methodology, and his testimony adequately supported the ALJ's findings at Step 5.

"[T]he substantial evidence standard does not foreclose an ALJ from relying on the expertise of a vocational expert and to do so without requiring the expert to lay a further foundation about the sources that the expert has consulted in order to arrive at the expert's job-number information." *Crespo v. Comm'r of Soc. Sec.*, No. 3:18-cv-00435 (JAM), 2019 WL 4686763, at *9 (D. Conn. Sept. 25, 2019). Indeed, a vocational expert's testimony concerning job numbers

may constitute substantial evidence even when the expert refuses to disclose the underlying data. *Biestek v. Berryhill*, 587 U.S. 97, 105–06 (2019) (holding that, notwithstanding vocational expert's refusal to provide underlying data, expert's testimony regarding job availability "would be the kind of evidence—far 'more than a mere scintilla'—that 'a reasonable mind might accept as adequate to support' a finding about job availability") There is the possibility that an expert's testimony is otherwise so deficient in nature as to not constitute substantial evidence, *id.* ("And of course, a different (maybe less qualified) expert failing to produce such data might offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar."), but that is not the case here.

The vocational expert provided the general source for his opinions, stating that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). R. 74; *see also McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) ("[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally."). To the extent that the DOT fails to support portions of his testimony—for example, employment numbers associated with "Standard Occupational Classification System" codes, *see* ECF No. 24-1 at 32, or certain limitations addressed in his testimony, *see* R. 74 (ALJ to VE: "Now, I know that the DOT doesn't talk about a sit/stand option. It doesn't talk about absenteeism, direction of reaching, and off task . . . .")—the expert had decades of relevant professional experience upon which he could otherwise rely. The expert's resume states that he has been a "Self Employed Vocational Rehabilitation Counselor" working with the U.S. Department of Labor and Social Security Administration, among others, since 1985

24

and that he is an "Approved Vocational Expert" for the Social Security Administration.[9] *Id.* 352-53. Furthermore, I need not presume that the expert relied upon this experience in formulating his conclusions, as he stated as much. *See, e.g.*, *id.* 73-74 ("There'd be work as an electronic assembler . . . The DOT classifies that job as an SVP: 3, however from experience I find that those jobs will generally be learned in 30 days, so I would consider it to be an SVP: 2 job.").

The plaintiff's argument boils down to a belief that when a vocational expert fails to provide his underlying methodology[10] or data, his testimony, as a matter of law, does not constitute substantial evidence. For the reasons above, I disagree. Of note, this constitutes the limit of the plaintiff's argument on this point. The plaintiff does not suggest that the expert's opinions were inaccurate, nor does she offer data that casts doubt on those opinions; she merely argues that the opinions were unsupported.[11] Because that argument is not supported by law or the record, it is not a basis for remand.

---

[9] The plaintiff points to the vocational expert's resume to argue he was not qualified to opine on job availability. ECF No. 29 at 4. First, the plaintiff argues that "national job incidence data is wholly irrelevant in the day-to-day work of a vocational rehabilitation counselor . . . in which the task, at bottom, is placing Individual A in Job B in Location C." *Id.* The plaintiff's characterization of the expert's job description is plainly reductive and does not reflect the expert's actual job responsibilities, which include "conduct[ing] labor market surveys." R. 353. Perhaps anticipating this response, the plaintiff also argues that the expert's labor market survey work "is irrelevant to the issue," as a "survey of a *local labor market* provides no information as to the *national market*." ECF No. 29 at 4. The plaintiff neglects to consider, however, that conducting surveys of *different* local labor markets can provide a national outlook. Moreover, and as previously discussed, the expert was not required to disclose his methodology and nowhere during his testimony did he suggest that local market surveys formed part of that methodology. Finally, I cannot simply brush aside the far more salient point that, according to his resume, he is certified by the Social Security Administration as an Approved Vocational Expert. R. 353. The plaintiff nowhere argues that such a certification is in some way perfunctory or otherwise inadequate.

[10] In her reply brief, the plaintiff cites case law from the Seventh Circuit to further argue that the expert was required to disclose his methodology. ECF No. 29 at 2 (citing *Ruenger v. Kijakazi*, 23 F.4th 760 (7th Cir. 2022)). As discussed above, that is not the law in this Circuit.

[11] The plaintiff also argues, somewhat in passing, that the ALJ failed to inform the plaintiff of her right to cross-examine the vocational expert. *See* ECF No. 29 at 1 n.2; ECF No. 24-1 at 21 ("[The plaintiff] was not asked if she wished to cross-examine [the vocational expert]."). The plaintiff undoubtedly had a right to cross-examine the vocational expert, though any failure on the ALJ's part to inform her of this right is harmless error if the ALJ "vigorously explor[ed] for all the relevant facts . . . ." *Alvarez v. Bowen*, 704 F. Supp. 49, 53-54 (S.D.N.Y. 1989).

## III.   CONCLUSION

For the reasons above, I GRANT the Commissioner's motion to affirm (ECF No. 28) and

DENY the plaintiff's motion to reverse (ECF No. 24). The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
      March 23, 2026

---

In a letter the Commissioner sent to the plaintiff informing the plaintiff of her right to request a hearing before an ALJ, the Commissioner further informed the plaintiff that "[t]he ALJ [ ] can require people to bring important papers to your hearing and give facts about your case. You can question these people at your hearing." R. 120. Moreover, at the start of the hearing, the ALJ advised the plaintiff, "[i]f you have any questions about anything going on throughout the hearing, please don't hesitate to let me know. I don't want you sitting there being like, what do[es] he mean, what did he say? So if you have a question, you know, ask the question." R. 55. Finally, after the ALJ had questioned the vocational expert and summarized the hypotheticals he posed to the expert for the plaintiff's benefit, the following colloquy between the ALJ and the plaintiff occurred:

> **ALJ**: So that was a rundown of [the] hypotheticals I gave to the vocational expert. Do you have any questions about those?
> **The plaintiff**: No, I do not, Your Honor.
> **ALJ**: Are there any work-related limitations that I did not express to the vocational expert that you would like to ask about in terms of anything, really?
> **The plaintiff**: No, it was [ ] very good . . . .

R. 75-76. The above—either individually or collectively—likely constituted sufficient notice of the right to cross examination, though it is a close call. *See Harris v. Saul*, No. 3:18-cv-2064 (VLB), 2020 WL 1515234, at *9 (D. Conn. Mar. 30, 2020) ("The Court finds that [the] ALJ [ ] informed [the plaintiff] of the core of her right to cross-examine the vocational expert, namely, to ask him additional questions about limitations."). I need not decide one way or the other, however, as I find no prejudice arising from the lack of cross-examination. Here, the ALJ explored the relevant facts, posing detailed hypotheticals to the vocational expert and going so far as to push back on the expert when his response did not appear to conform to the hypothetical. *See* R. 72-73 (VE: "And there'd be work as a bus monitor." ALJ: "Well, wait a second. Wait a second. Wait a second. What about responsibility for the safety of others?" VE: "Oh, okay. Yeah, that was not – that would eliminate that job, Your Honor. Let's see."). Because the ALJ's hypotheticals accurately reflected the plaintiff's RFC and because the ALJ otherwise had reason to rely upon the expert's testimony, there is no basis for remand. *See Harris*, 2020 WL 1515234, at *9 (holding that the ALJ—who posed detailed hypotheticals, asked the vocational expert "whether [his] testimony was consistent with the Dictionary of Occupational Titles," and asked the plaintiff if "there were any other work-related limitations" that the ALJ did not express to the vocational expert that the plaintiff wanted to ask him about—did not err in failing to inform the plaintiff of her right to cross-examination insofar as the ALJ's hypotheticals accurately "reflected his ultimate RFC determination.")

26